**Supreme Court**

No. 2011-248-C.A.
(N1/10-45A)
No. 2012-321-M.P.
(W2/97-190A)
(P2/01-99A)

State                                   :

        v.                              :

Lawrence Clay.                          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2011-248-C.A.
(N1/10-45A)
No. 2012-321-M.P.
(W2/97-190A)
(P2/01-99A)

|               |   |
|---------------|---|
| State         | : |
| v.            | : |
| Lawrence Clay.| : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** A young girl's decision to leave her grandparents' home surreptitiously in the early-morning hours in order to rendezvous with her boyfriend resulted in consequences she did not foresee: her abduction in Middletown, an automobile ride to New Bedford during which she was concealed beneath a tarpaulin, and an alleged sexual assault in the Commonwealth of Massachusetts.

The defendant, Lawrence Clay, appeals from a Superior Court judgment of conviction, having been found guilty by a jury of kidnapping of a minor and reckless driving, for which he was sentenced to sixty years, with thirty years to serve and thirty years suspended, with probation. On appeal, defendant argues that the trial justice erred in: (1) admitting testimony about the alleged sexual assault; and (2) denying defendant's motion for a new trial.[1] For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

---

[1] The defendant's trial was held concurrently with a probation-violation hearing, at the conclusion of which the trial justice "vacated" two previously suspended sentences in their entirety. The defendant did not initially appeal from this judgment, but this Court granted his subsequent petition for writ of certiorari to review these probation-violation adjudications. The probation violation review was then consolidated with defendant's appeal. At oral argument,

# I

## Facts[2] and Procedural History

In the early morning of October 29, 2009, after hours of online instant-messaging, a fourteen-year-old girl whom we shall call Sally Jones (Jones) agreed to sneak out of her grandparents' apartment in the Town of Middletown to meet her seventeen-year-old boyfriend. At approximately 2:50 a.m., after stuffing clothing underneath her sheets in an attempt to conceal her departure from her grandparents, she set off on the roughly two-mile walk to the boyfriend's residence.

At trial, Jones testified that after walking a distance down West Main Road, she turned onto Forest Avenue, when a car swerved out of the Shell gas station on the corner and pulled up beside her. The driver, whom Jones would later identify as defendant, asked her where she was going. According to Jones, upon learning that she was walking to her boyfriend's house, defendant demanded that she get in the vehicle, threatening to shoot her if she did not comply. Jones opened the door and got in the front seat. The vehicle, a dark green Nissan Maxima adorned with spray-painted orange flames, was crammed with items such as trash and garbage bags, a garden hose, various items of clothing, backpacks, gloves, and shoes. Jones testified that defendant covered her with a large, gray automobile cover and towel, spun the car around and, ignoring her repeated requests to take her home, sped north on West Main Road toward Portsmouth.

Jones testified that defendant engaged her in a series of personal questions, asking her name, age, and whether she and her boyfriend were sexually active together; she added that

however, defendant conceded that he was waiving any allegation of error with respect to the probation-violation proceeding.

[2] Our recitation of the facts is derived from the testimony elicited at trial, primarily the testimony of the complaining witness.

defendant became angry if she did not respond. Although still covered with the tarpaulin, Jones was occasionally able to peek out in an attempt to ascertain her surroundings, at one point identifying Portsmouth High School on her right. Jones also noticed flashing red and blue lights that defendant claimed were the police chasing them, but were later confirmed to be police cruisers monitoring an overnight construction detail on West Main Road.

After driving approximately fifteen minutes, defendant pulled into a Dunkin' Donuts to order a coffee at the drive-through window, while Jones remained hidden underneath the tarpaulin in the passenger seat. While at the drive-through window, defendant introduced himself to Quiana Baptiste, who was working the third shift at Dunkin' Donuts that night. The defendant, who Baptiste testified was edgy and nervous, introduced himself as a nightclub promoter, gave her his card, and told her that "he would put [her] on the VIP list." Although Baptiste initially declined the offer, she eventually conceded, scrawling a fake telephone number on defendant's business card before returning it to him. Jones testified that she thought that when the woman came back with the coffee it would be a good time to uncover and ask for help, so she attempted to make what she described as a "slick movement," only to have defendant hit her on the head, shocking her and preventing any further movement.

After thwarting Jones's attempt to seek help, defendant left the Dunkin' Donuts and proceeded to a Shell station in what Jones thought might have been Fall River. While defendant was inside the gas station, Jones managed to peek out yet again, this time seeing a cab driver filling up at a nearby pump. Although defendant was no longer in the car, Jones testified that she did not attempt to jump out and seek help because she feared that defendant had a weapon. After returning to the car, defendant continued on to his aunt's apartment, saying he was going to use the bathroom there. Jones testified that when defendant got out of the car at his aunt's apartment

- 3 -

complex, she did not attempt to run because she was unfamiliar with the area and did not know where defendant was. Jones said that when defendant exited the vehicle, she noticed that he had left his cell phone on the dashboard; however, before she had the opportunity to call for help, defendant returned to the car and angrily snatched the phone away.

The defendant next drove Jones to an empty football field surrounded by high grass and white construction trailers, and removed the tarpaulin and towel. Jones testified that defendant began to touch her "inappropriately." She told the jury that despite her repeated pleas for him to stop, defendant overpowered her and removed her pajama bottoms and underwear, discarding them in the back seat. She described how defendant repositioned her so that her knees faced him, and proceeded to pull his pants down, get on top of her, and insert his penis into her vagina. Jones testified that she tried to physically resist defendant by pushing on his shoulders, but he was too strong for her. Jones further testified that he refused to return her clothing and underwear, instead giving her a pair of sweatpants from his wardrobe of clothing in the backseat. The defendant then returned to the apartment complex parking lot, where he showed Jones a memorial card for his recently deceased cousin. Jones said she was crying and kept asking defendant to take her home, but that he refused because she had "disrespected his cousin * * * by crying."

Jones testified that as they were sitting in the parking lot, she noticed two women exiting the apartment building with their babies. She further testified that she managed to open the door, kick free from defendant's grasp and run toward the women; however, when she ran toward the two women, screaming that she had been kidnapped, the women ignored her, so she continued past them out to the main street. Jennifer Ferrera, a math teacher at nearby New Bedford High School, was driving to drop off lesson plans at school when she saw Jones, crying and waving

for her to stop. Ferrera testified at trial that Jones was crying hysterically, shouting that she had been kidnapped and that defendant was coming back for her, so Ferrera got out of her truck and waved to the driver behind her for help.[3] The driver, another New Bedford High School teacher, allowed the frantic Jones into the passenger side of his pickup truck and dialed 9-1-1. The police arrived shortly thereafter and took Jones to Saint Luke's Hospital for examination and then to the New Bedford police station.

Jones then met with detectives from both the New Bedford and Middletown police departments, to whom she gave several conflicting accounts of what transpired between her and defendant. At trial, Jones admitted that she initially told the New Bedford police and the hospital personnel that defendant had broken into her home and abducted her at gunpoint. She also admitted to changing her story to the New Bedford police, testifying that she told them defendant had physically forced her into his car and that the Middletown Shell gas station surveillance camera would corroborate her story. Jones testified on both direct and cross-examination that the reason she lied to the police was that she did not think that anyone would help her if they had known that defendant did not physically force her into the car. In addition to the conflicting accounts of her abduction, Jones was impeached at trial with numerous other lies or misrepresentations that she told both before and during the investigation. Jones told the New Bedford police that she was not sexually active with her boyfriend; however, at trial he testified to the contrary. In addition, Jones initially said that defendant had been driving 165 miles per hour, but later testified that she did not actually see how fast he was going. Jones was also impeached at trial with evidence that she had previously misrepresented her age on her MySpace account.

---

[3] Jennifer Ferrera testified: "[Jones] was saying, 'Let me in. He's going to come back for me.' And she did say she had been kidnapped, and she was scared[,] definitely."

On the morning of October 30, 2009, Detectives April Fernandez and Richard Gamache of the Middletown police department took Jones and her grandmother on a ride-along, in an attempt to retrace the drive and piece together Jones's story. Detective Gamache testified at trial that the scenery along the route matched in detail Jones's original description given to the New Bedford police, including the location of the Dunkin' Donuts and the description of the football field. A review of that Dunkin' Donuts surveillance tape taken on the morning of the kidnapping showed defendant buying coffee and Baptiste writing something on a business card and handing it to defendant, a scene independently corroborated at trial by both Jones and Baptiste.

Meanwhile, the Middletown police department put out a call to all state and nearby local police departments to be on the lookout for defendant's green, flame-painted Nissan. Late in the evening of October 29, 2009, Newport police officer Joseph Lavallee spotted defendant's vehicle, activated his lights, and initiated pursuit. According to Officer Lavallee, defendant proceeded to lead him on a chase through the streets of Newport, racing through stop signs at up to forty miles per hour. As he approached a red light at the intersection of Farewell Street and Van Zandt Avenue, defendant, now traveling upwards of seventy miles per hour, swerved to avoid a car turning onto Farewell Street. The defendant was unable to avoid a collision and struck the front side of the other vehicle before eventually careening to a stop some several hundred feet down the road. Officer Lavallee, as well as another officer who had arrived on the scene, ran, guns drawn, toward defendant's badly damaged vehicle, ordered him out of the car, and placed him under arrest. Officer Lavallee testified that as defendant was being handcuffed, he began apologizing and made several unsolicited comments to the officers, stating that, "They're trying to kill me * * * . All I did was give her a ride to Fall River." After being advised of his constitutional rights, defendant continued to speak to the officers. According to

Officer Lavallee, "he said the Bloods were trying to kill him.  He said some girl set him up, explained that she - - she approached him and said that a cop was trying to rape her so he gave her a ride to Fall River."

Once defendant's vehicle was impounded at the police station, the Middletown police, acting pursuant to a search warrant, seized numerous items from the vehicle, including: trash bags, a towel, the pajama bottoms Jones had been wearing, funeral cards written "In Loving Memory of Wayne Rice," and a business card bearing Quiana Baptiste's handwriting.  After defendant had been remanded to the Adult Correctional Institutions (ACI), correctional officer Steven Lombardi found a pair of red women's underwear concealed in defendant's boot. Although Lombardi testified that defendant claimed ownership of the underwear from his prior employment as a stripper in New Jersey, at trial Jones identified the underwear as the pair defendant had forcibly removed from her on the night of the kidnapping.

The defendant was subsequently tried on charges of kidnapping of a minor and reckless driving; and, on October 19, 2010, a jury returned a verdict of guilty on both counts.  The trial justice denied defendant's motion for a new trial; and, on March 17, 2011, sentenced defendant to sixty years at the ACI, with thirty years to serve and thirty years suspended, with probation. In addition, the trial justice found defendant to be in violation of his probation for two previously imposed sentences and vacated the suspended sentences, imposing sentences of 114 and 142 months to run concurrently.  The defendant filed a timely notice of appeal.

We will address the issues raised on appeal seriatim.

## A

## Sexual Assault Evidence

Prior to the commencement of trial, defendant moved in limine "to exclude any and all reference to the allegation of sexual assault." Categorizing the sexual assault as "inextricably woven from the crime charged," the trial justice denied the motion. There is no question that defendant appropriately preserved the issue for appellate review by objecting to the admission of such evidence at trial.

On appeal, defendant argues that the trial justice erred in admitting evidence of the alleged sexual assault in violation of Rule 404(b) of the Rhode Island Rules of Evidence because the evidence "was not reasonably necessary to present a complete story to the jury with regard to the charge of kidnapping." Additionally, defendant urges that the evidence of the sexual assault was "irrelevant to prove any of the specified Rule 404(b) exceptions." Finally, defendant asserts that the testimony regarding the sexual assault was "unrelated and irrelevant to the charge for which [he] was being tried," and, limiting instructions notwithstanding, was "extremely prejudicial" and should have been excluded pursuant to Rule 403 of the Rhode Island Rules of Evidence.

The state argues, on the other hand, that admission of evidence regarding the sexual assault was proper Rule 404(b) evidence, insofar as the assault was probative of defendant's motivation and intent to get Jones into his vehicle. The state further contends that the sexual assault was so inextricably intertwined with the kidnapping that it "was necessary to provide the jury with a complete tapestry of events as they unfolded on the night of the crime." Lastly, the state argues that the trial justice did not abuse her discretion under Rule 403 when she admitted

the evidence of the sexual assault with an instruction to the jury limiting "consideration of the evidence to defendant's motive, intent or plan."

## 1. Standard of Review

In reviewing the admission or exclusion of evidence, it is well settled that "[t]he admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of discretion is apparent." State v. Rios, 996 A.2d 635, 638 (R.I. 2010) (quoting State v. Gautier, 950 A.2d 400, 411 (R.I. 2008)).

## 2. Rules of Evidence 404(b) and 403

In determining whether the trial justice abused her discretion in admitting evidence of the sexual assault, we must first examine the scope of admissible evidence under Rule 404(b). Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." Rule 404(b) thereby acts to exclude evidence of a defendant's "crimes, wrongs, or acts * * * to prove that the accused has a criminal disposition and, therefore, is more likely to have committed the crime for which he [or she] stands accused * * * ." State v. Martinez, 59 A.3d 73, 85 (R.I. 2013) (quoting State v. Rodriguez, 996 A.2d 145, 151 (R.I. 2010)). However, Rule 404(b) does allow admission of crimes, wrongs, or acts when offered "for other purposes, such as proof of motive, opportunity, intent, preparation, [or] plan * * * ." Additionally, Rule 404(b) "does not require exclusion of otherwise legally probative evidence simply because such evidence might also suggest past criminal activity." Martinez, 59 A.3d at 85 (quoting State v. Garcia, 743 A.2d 1038, 1051 (R.I. 2000)). This Court has also held that evidence of prior crimes or bad acts is admissible "if such evidence has independent relevance in respect to the proof of an element material to the chain of proof of the crime in issue," id., (quoting Garcia, 743 A.2d at 1052), or

when "prior acts 'are interwoven or in instances when introduction is necessary for a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence.'" Rodriguez, 996 A.2d at 150-51 (quoting State v. Pona, 948 A.2d 941, 950 (R.I. 2008)). In reviewing a trial justice's admission of Rule 404(b) evidence, this Court is "disinclined to perceive an abuse of discretion so long as the record contains some grounds for supporting the trial justice's decision * * * ." State v. Ciresi, 45 A.3d 1201, 1211 (R.I. 2012) (quoting State v. Moreno, 996 A.2d 673, 678 (R.I. 2010)).

Evidence that may otherwise be admissible under Rule 404(b) is still subject to the Rule 403 balancing test, which excludes otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * * ." Therefore, Rule 403 "is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence," State v. Mlyniec, 15 A.3d 983, 997 (R.I. 2011) (quoting State v. Gaspar, 982 A.2d 140, 148 (R.I. 2009)), and "the trial justice must carefully weigh the probative value of the evidence against the danger of unfair prejudice." Gaspar, 982 A.2d at 148 (quoting State v. John, 881 A.2d 920, 927 n.14 (R.I. 2005)).

### 3. Discussion

The defendant first argues that the trial justice erred in admitting evidence of the sexual assault because it was not inextricably woven with the kidnapping charge, and thus was not necessary to provide a complete picture of the issues for the jury. The defendant contends that the omission of the sexual assault from evidence would not have led to any "chronological void" in the narrative of events; rather its admission only served to complicate the single issue before the jury. The defendant posits that the evidence concerning the sexual assault was propensity evidence, offered solely to portray defendant as "a child rapist who kidnaps his victim." In

- 10 -

support of this proposition, defendant cites to Pona, 948 A.2d at 951, in which this Court reversed the defendant's murder conviction, based upon, inter alia, the erroneous admission of Rule 404(b) evidence. [4]

The state argues that the evidence of the sexual assault was probative of defendant's "motive and intent in forcing [Jones] by threat of violence and driving her, shrouded in a tarpaulin, to New Bedford." Additionally, the state, also citing Pona, argues that the sexual-assault evidence provided a "complete and coherent narrative" of the events that transpired from the time defendant forced the victim into his car in Middletown to her eventual escape hours later in New Bedford.

In our opinion, the sexual assault evidence in this case—which differs markedly from the erroneously admitted Rule 404(b) evidence in Pona—was inextricably woven with the kidnapping charge and was properly admitted by the trial justice. Unlike the testimony in Pona, which concerned the defendant's involvement with a prior murder and had little relation to the charge at hand, the sexual assault in this case took place during the course of the kidnapping for which defendant was charged. See Pona, 948 A.2d at 945. After a thorough review of the record, we are of the opinion that the evidence presented at trial concerned one continuous event that was indeed necessary in order for the jury to hear a complete and coherent rendition of what transpired in the early morning hours of October 29, 2009. But for the fact that defendant

---

[4] In State v. Pona, 948 A.2d 941, 942 (R.I. 2008), the defendant was charged with murder and conspiracy to commit murder in connection with the death of Jennifer Rivera, an eighth-grade girl who had been slated to testify against the defendant at his coming trial for the murder of Hector Feliciano. The night before she was to testify against the defendant, she was shot execution-style in the back of the head. Id. At the defendant's trial for Rivera's murder, the trial justice admitted testimony from a detective stating that he found the defendant's pager and fingerprints at the scene of the Feliciano murder. Id. at 950. This Court held that the evidence was too tenuous to prove the defendant's motive to kill Rivera, and its admission under Rule 404(b) of the Rhode Island Rules of Evidence served only to "highlight the propensity of Pona as a person who had murdered before and who would not hesitate to murder again." Id. at 949.

crossed the state line, the sexual assault would likely have been tried together with the kidnapping charge.

The complaining witness testified to the entire sequence of events, from the time she arranged to sneak out to meet her boyfriend and her abduction in Middletown, until her eventual escape in New Bedford some hours later. In admitting the sexual-assault evidence over defense counsel's objection, the trial justice categorized the assault as "an event that is inextricably woven from the crime charged" and found it "completely illogical under the allegations to extrude and excise that event from the State's primary case regarding kidnapping." We agree and are satisfied that the trial justice did not abuse her discretion in admitting evidence of the sexual assault under Rule 404(b).

Although we have determined that evidence pertaining to the alleged sexual assault was properly admissible for the reasons articulated by the trial justice, we address briefly defendant's contention that such evidence should have been excluded because it was not relevant to establishing any of the "other purposes" specifically listed in Rule 404(b). On two occasions the trial justice gave a limiting instruction concerning evidence of a sexual assault, admonishing the jury that it could consider such evidence only as evidence of "motive, intent or plan of the crime in controversy."[5]

---

[5] Prior to the presentation of any evidence in the case, the trial justice issued the following instruction:

> "[Trial Justice]: * * * Mr. Clay is not on trial here for sexual assault; he is on trial here for the charge of kidnapping and reckless driving. If and when evidence * * * comes in of a sexual assault, you cannot receive that evidence as a juror to show or to infer that Mr. Clay is of bad character, that he must have done this crime because he did that crime, it's just not before you. When and if evidence of a sexual assault comes in, the only limited way in which you can receive and consider that particular evidence in the

Although "[c]onviction of crime never requires proof of motive," State v. Caruolo, 524 A.2d 575, 584 (R.I. 1987), "motive is an item of circumstantial evidence that the jury may weigh in light of other facts and circumstances in evidence." Id. Here, the evidence of a sexual assault that allegedly occurred in the same sequence of events that began when the fourteen-year-old complaining witness entered defendant's vehicle in Middletown is, we believe, highly probative of defendant's motive for kidnapping her in the first place. As defendant argues, however, evidence of motive may be relevant and thus admissible, "provided it does not cause the jury to speculate or focus on collateral matters." Id. We now turn, therefore, to the question of whether the evidence of the sexual assault should have been excluded because it was unfairly prejudicial.

The defendant argues that, irrespective of its admissibility under Rule 404(b), given the graphic nature of Jones's testimony concerning the sexual assault, the probative value of such evidence was substantially outweighed by the danger of unfair prejudice and should have been excluded under Rule 403. The defendant also argues that the evidence should have been excluded because of the likelihood of the jury confusing the uncharged sexual assault with the kidnapping for which he was on trial. In addressing these arguments, we begin by noting the well-settled principle that "[i]t is within the sound discretion of the trial justice whether to admit

context of this trial is as some evidence of the accused's motive, intent, or plan * * * ."

After the state's direct examination of Jones, the trial justice issued another limiting instruction regarding the assault:

"[Trial Justice]: * * * Ladies and gentlemen, before we resume with the testimony, I am obligated to repeat to you that any testimony which is furnished to you, presented to you on the issue of sexual assault has absolutely no bearing on the crime of kidnapping, which is the offense under your consideration. It can be considered only if you choose to consider it as evidence of motive, intent or plan of the crime in controversy. I repeat to you that it cannot be regarded by you to show evidence of bad character by Mr. Clay or of evidence that any crime was committed."

or exclude evidence under Rule 403." <u>Mlyniec</u>, 15 A.3d at 997 (quoting <u>John</u>, 881 A.2d at 927). This Court "will not disturb such a determination on appeal absent a clear abuse of discretion." <u>Id.</u>

Here, the record demonstrates that the decision to admit the evidence of the sexual assault in its entirety was not made without careful thought and deliberation on the part of the trial justice. At trial, defense counsel objected to the proposed introduction of the evidence, arguing that it was extremely prejudicial to force him to try a kidnapping case while "defending a rape case at the same time." In overruling the objection, the trial justice explained that while she "appreciate[s] the uncharged crime * * * the whole thing just is completely illogical under the allegations to extrude and excise that event from the State's primary case regarding kidnapping." The trial justice cited hearing testimony from a Det. Swierk concerning several statements made by defendant that the sex was consensual, including a reference that Jones had initiated it, and also that Jones was looking for defendant to rescue her.[6] The trial justice stated that, in light of the allegations, "the [c]ourt is constrained to find the logical and fair way to extrude those allegations from the alleged factual scenario here * * * ."

It is clear to us that the trial justice considered the potential effects of unfair prejudice and confusion of the issues and acted accordingly, issuing limiting instructions to the jury on two occasions during the trial; defendant did not object to either instruction and declined the trial justice's offer of a third limiting instruction.[7] Accordingly, we are satisfied that the trial justice

---

[6] As noted <u>supra</u>, Officer Lavallee testified that defendant had claimed that Jones had initially approached him, saying that a "cop" had been trying to rape her.

[7] After both parties had rested, the following exchange occurred between the trial justice and defense counsel:

> "[Trial Justice]: * * * [Counsel], I neglected to ask you when we were discussing instructions in chambers, do you want another repetition of the assault? How – or do you just want that

did not abuse her discretion in admitting the evidence of the sexual assault, and we discern no grounds for vacating the judgment in this regard.

**B**

**Motion for a New Trial**

On appeal, defendant argues that the trial justice, in denying his motion for a new trial, misconceived and overlooked critical evidence when she failed to consider the inconsistencies and lies in the complaining witness's testimony. The defendant accurately points out many of the inconsistencies in Jones's differing versions of the events that she narrated throughout the course of the investigation, and he argues that she "was no doubt lying yet again about why she entered [defendant's] car * * * ." Secondly, defendant argues that the fact that Jones wept throughout her direct examination, only to have her "tears dried up" on cross-examination, was indicative of her penchant to lie for her own benefit, a fact overlooked by the trial justice in denying the motion. Finally, defendant argues that, despite a number of statements made to police that were arguably against his interest, "never once did he admit that he kidnapped this young woman," a fact presumably evincing his innocence.

---

left alone, you know, say in argument that's not what we're here for?

"[Counsel]: You've instructed them enough, and I'm okay with that. I can certainly address that in argument.

"[Trial Justice]: Okay. I just want you to feel free to reference my earlier cautionary instructions.

"[Counsel]: I will.

"[Trial Justice]: I didn't see the need to highlight it in these instructions.

"[Counsel]: That's fine, judge."

**1. Standard of Review**

"When deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. LaPierre, 57 A.3d 305, 310 (R.I. 2012) (quoting State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012)). To make this determination, "the trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting Bunnell, 47 A.3d at 232). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. (quoting Bunnell, 47 A.3d at 232). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." Id. (quoting Bunnell, 47 A.3d at 232).

"Because a trial justice, when deciding a motion for a new trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses, on appeal, this Court's review is deferential." LaPierre, 57 A.3d at 310 (quoting Bunnell, 47 A.3d at 232-33). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Bunnell, 47 A.3d at 233).

**2. Discussion**

After a thorough review of the record, it is apparent to this Court that defendant's arguments are nothing more than a disagreement with the trial justice's assessment of the

credibility of the witnesses and the weight of the evidence. The defendant asserts that the lies and inconsistencies render the evidence of the kidnapping "far too unreliable to support the verdict." However, in reviewing this case, "we do not focus on whether this Court simply agrees or disagrees with the trial justice's credibility determinations." LaPierre, 57 A.3d at 311. This Court is deferential to those determinations, and, "if the trial justice has stated sufficient grounds for denying a motion for a new trial, we will not overturn that decision unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Bunnell, 47 A.3d at 233).

In making her ruling on the motion for a new trial, the trial justice recounted the complaining witness's trial testimony concerning the time she entered defendant's vehicle—specifically, her testimony that defendant threatened, "[i]f you do not get in the car, I will shoot you." The trial justice focused on Jones's response to the threat:

> "[Trial Justice]: [Jones] reiterated she did not want to get into the car and only got into the car because she believed his threats even though she opened the door to the car and let herself in. So according to her testimony, she was, if you will, constructively forced into the car by a threat she believed [defendant] would make good on."

The trial justice acknowledged that "it clearly is a question of credibility" and that "the jury believed beyond a reasonable doubt unanimously that she believed [defendant's] initial threat to get in the car or she would be shot." The trial justice determined that, in light of the evidence, the complaining witness's credibility, and the instructions, the jury "was well within their province, despite [counsel's] skill in cross-examination and other points that he made, to accept and endorse [Jones's] version of the events, and the [c]ourt cannot say they were wrong in doing so."

After an exhaustive review of the record, this Court is of the opinion that the trial justice carefully considered both the consistencies and inconsistencies in the evidence, as well as the credibility of the witnesses's testimony.  There is no indication that the trial justice "overlooked or misconceived material evidence or was otherwise clearly wrong." LaPierre, 57 A.3d at 311 (quoting Bunnell, 47 A.3d at 233).  The trial justice did not abuse her discretion in denying the defendant's motion for a new trial; thus, we have no cause to vacate her ruling.

## III

## Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed, and the papers of the cases shall be returned to that court.



**TITLE OF CASE:**       State v. Lawrence Clay.

**CASE NO:**       No. 2011-248-C.A.
                   (N1/10-45A)
                   No. 2012-321-M.P.
                   (W2/97-190A)
                   (P2/01-99A)

**COURT:**       Supreme Court

**DATE OPINION FILED:**   November 20, 2013

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**       Newport County Superior Court

**JUDGE FROM LOWER COURT**:

              Associate Justice Melanie Wilk Thunberg

**ATTORNEYS ON APPEAL:**

              For State:   Jane M. McSoley
                       Department of Attorney General

              For Defendant:  Catherine Gibran
                       Office of the Public Defender